FILED

JUN 03 2011

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

|  |  |
|---|---|
| In re | Case No. 09-43872-A-7 |
| JOHN and RENA WILLIAMS, | Docket Control No. GJH-2 |
| Debtors. | Date: April 11, 2011<br>Time: 10:00 a.m. |

**MEMORANDUM**

The trustee's objection to the debtors' exemptions will be sustained in part and overruled in part for the reasons explained below.

I

The trustee objects to the debtors' exemption of: (1) a Pensco Trust Co. IRA, which owns a vacant parcel in Cameron Park, California, with a scheduled value of $125,000; (2) a 401k account belonging to Debtor John Williams with a petition date balance of $117,271.80; and (3) a 401k account belonging to Debtor Rena Williams with a petition date balance of $123,871.77.

While Amended Schedule C (Docket 54) claims these accounts as exempt under both Cal. Civ. Proc. Code § 703.140(b)(10)(E) and 11 U.S.C. § 522(b)(3)(C), the opposition to the objection indicates that the debtors are asserting exemption only under 11 U.S.C. § 522(b)(3)(C), because according to them, 11 U.S.C. §

522(b)(3)(C) "is the prevailing law."  Therefore, debtors have voluntarily abandoned their exemptions under Cal. Civ. Proc. Code § 703.140(b)(10)(E).

Fed. R. Bankr. P. 4003(b)(1) provides:

[A] party in interest may file an objection to the list of property claimed as exempt within 30 days after the meeting of creditors held under § 341(a) is concluded or within 30 days after any amendment to the list or supplemental schedules is filed, whichever is later. The court may, for cause, extend the time for filing objections if, before the time to object expires, a party in interest files a request for an extension.

The objection is timely as it was originally filed on May 6, 2010, within 30 days of the last amendment of Schedule C, on April 16, 2010 (Docket 54).

Next, 11 U.S.C. § 522(b) provides:

(1) Notwithstanding section 541 of this title, an individual debtor may exempt from property of the estate the property listed in either paragraph (2) or, in the alternative, paragraph (3) of this subsection. In joint cases filed under section 302 of this title and individual cases filed under section 301 or 303 of this title by or against debtors who are husband and wife, and whose estates are ordered to be jointly administered under Rule 1015(b) of the Federal Rules of Bankruptcy Procedure, one debtor may not elect to exempt property listed in paragraph (2) and the other debtor elect to exempt property listed in paragraph (3) of this subsection. If the parties cannot agree on the alternative to be elected, they shall be deemed to elect paragraph (2), where such election is permitted under the law of the jurisdiction where the case is filed.

(2) Property listed in this paragraph is property that is specified under subsection (d), unless the State law that is applicable to the debtor under paragraph (3)(A) specifically does not so authorize.

(3) Property listed in this paragraph is –

. . .

(C) retirement funds to the extent that those funds are in a fund or account that is exempt from taxation under section 401, 403, 408, 408A, 414, 457, or 501(a) of the Internal Revenue Code of

-2-

1986.

Fed. R. Bankr. P. 4003(c) provides that:

> In any hearing under this rule, the objecting party has the burden of proving that the exemptions are not properly claimed. After hearing on notice, the court shall determine the issues presented by the objections.

A claim of exemption is presumptively valid. Carter v. Anderson (In re Carter), 182 F.3d 1027, 1029 n.3 (9th Cir. 1999); Tyner v. Nicholson (In re Nicholson), 435 B.R. 622, 630 (B.A.P. 9th Cir. 2010); Hopkins v. Cerchione (In re Cerchione), 414 B.R. 540, 548-49 (B.A.P. 9th Cir. 2009); Kelley v. Locke (In re Kelley), 300 B.R. 11, 16-17 (B.A.P. 9th Cir. 2003).

Under Rule 4003(c), once an exemption has been claimed, the objecting party has the burden to prove that the exemption is improper. See Carter at 1029 n.3; Cerchione at 548. This means that the objecting party has both the burden of production, i.e., to produce evidence in support of the objection, and the burden of persuasion. See Carter at 1029 n.3; Cerchione at 548.

But, when the objecting party produces sufficient evidence to rebut the presumptive validity of the exemption claim, the burden of production shifts to the debtors to establish the validity of the exemption. Even though the burden of persuasion always remains with the objecting party, when the objecting party overcomes the presumptive validity of the exemption claim, the debtors have the burden "to come forward with unequivocal evidence to demonstrate that the exemption is proper." See Carter at 1029 n.3; see also Cerchione at 549.

The standard for the objecting party's burden of persuasion is preponderance of the evidence. Nicholson at 631-33 (holding

-3-

that the applicable standard to exemption objections is preponderance of the evidence and citing Grogan v. Garner, 498 U.S. 279, 286 (1991)).

II

Turning to the merits of the exemption objections, 11 U.S.C. § 522(b)(3)(C) has two requirements, "(1) the amount the debtor seeks to exempt must be retirement funds; and (2) the retirement funds must be in an account that is exempt from taxation under one of the provisions of the Internal Revenue Code set forth therein."  See In re Thiem, No. 4:10-bk-19279-JMM, 2011 WL 182884, at *8 (Bankr. D. Ariz. Jan. 19, 2011); Bierbach v. Tabor (In re Tabor), 433 B.R. 469, 472 n.5, 475 (Bankr. M.D. Pa. 2010).

A. Pensco IRA

With respect to the Pensco IRA, the trustee has produced evidence that the debtors engaged in transactions disqualifying the Pensco IRA from tax exempt status.

26 U.S.C. § 408(e)(2) provides:

(A) If, during any taxable year of the individual for whose benefit any individual retirement account is established, that individual or his beneficiary engages in any transaction prohibited by section 4975 with respect to such account, such account ceases to be an individual retirement account as of the first day of such taxable year. For purposes of this paragraph –

> (i) the individual for whose benefit any account was established is treated as the creator of such account, and

> (ii) the separate account for any individual within an individual retirement account maintained by an employer or association of employees is treated as a separate individual retirement account.

26 U.S.C. § 4975(c) states that:

(1) For purposes of this section, the term 'prohibited transaction' means any direct or indirect –

> (A) sale or exchange, or leasing, of any property between a plan and a disqualified person;

> (B) lending of money or other extension of credit between a plan and a disqualified person;

> (C) furnishing of goods, services, or facilities between a plan and a disqualified person;

> (D) transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan;

> (E) act by a disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account; or

> (F) receipt of any consideration for his own personal account by any disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan.

26 U.S.C. § 4975(e) further provides:

(2) For purposes of this section, the term "disqualified person" means a person who is –

> (A) a fiduciary;

> (B) a person providing services to the plan;

> (C) an employer any of whose employees are covered by the plan;

> (D) an employee organization any of whose members are covered by the plan;

> (E) an owner, direct or indirect, of 50 percent or more of –

>> (i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of a corporation,

>> (ii) the capital interest or the profits interest of a partnership, or

>> (iii) the beneficial interest of a trust or

uncorporated enterprise, which is an
employer or an employee organization
described in subparagraph (C) or (D);

(F) a member of the family (as defined in
paragraph (6)) of any individual described in
subparagraph (A), (B), (C), or (E);

(G) a corporation, partnership, or trust or estate
of which (or in which) 50 percent or more of –

(i) the combined voting power of all classes
of stock entitled to vote or the total value
of shares of all classes of stock of such
corporation,

(ii) the capital interest or profits interest
of such partnership, or

(iii) the beneficial interest of such trust
or estate, is owned directly or indirectly,
or held by persons described in subparagraph
(A), (B), (C), (D), or (E);

(H) an officer, director (or an individual having
powers or responsibilities similar to those of
officers or directors), a 10 percent or more
shareholder, or a highly compensated employee
(earning 10 percent or more of the yearly wages of
an employer) of a person described in subparagraph
(C), (D), (E), or (G); or

(I) a 10 percent or more (in capital or profits)
partner or joint venturer of a person described in
subparagraph (C), (D), (E), or (G).

The Secretary, after consultation and coordination with
the Secretary of Labor or his delegate, may by
regulation prescribe a percentage lower than 50 percent
for subparagraphs (E) and (G) and lower than 10 percent
for subparagraphs (H) and (I).

(3) Fiduciary. – For purposes of this section, the term
"fiduciary" means any person who –

(A) exercises any discretionary authority or
discretionary control respecting management of
such plan or exercises any authority or control
respecting management or disposition of its
assets,

(B) renders investment advice for a fee or other
compensation, direct or indirect, with respect to
any moneys or other property of such plan, or has
any authority or responsibility to do so, or

> (C) has any discretionary authority or
> discretionary responsibility in the administration
> of such plan.

Such term includes any person designated under section
405(c)(1)(B) of the Employee Retirement Income Security
Act of 1974.

The Pensco IRA is a self-directed IRA, meaning that Debtor
John Williams is the one who manages the investment of assets
held in the IRA.  Mr. Williams is also the IRA holder or
beneficiary.  Under the "exercises any authority or control
respecting . . . disposition of [IRA] assets" language of 26
U.S.C. § 4975(e)(3)(A), then, Mr. Williams is a fiduciary for
purposes of 26 U.S.C. § 4975(e)(2)(A), and therefore is a
"disqualified person" for purposes of 26 U.S.C. § 4975.

Despite his status as a disqualified person under 26 U.S.C.
§ 4975, the trustee has produced evidence that Mr. Williams
furnished services to the IRA, in violation of 26 U.S.C. §
4975(c)(1)(C).  Mr. Williams, via his wholly-owned Integra
Development Group, performed work on the development of the IRA's
vacant lot of land and an adjacent unrelated lot.  This is
evident from the deposition testimony of Mr. Williams and from a
payment of $3,874 to IDG by Kenneth Development, the company that
owned the adjacent lot and, in Mr. Williams' words, took "the
lead" in developing the two lots.  See Docket 91, Ex. F at 79-80
& Ex. L.  The debtors and KD wanted to build duplexes on the two
lots and sell them.  They sought approval of a preliminary plan
for the project.  But, the real property market declined and they
stopped development.  See Docket 91, Ex. F at 76-81.

///

-7-

The debtors argue that Mr. Williams did not provide any services on the IRA lot development project. "Mr. Williams['] only role in the project was to request checks from Pensco as directed by Kenneth Development, Inc. for payment to third parties." Opposition to Objection (titled Reply) at 6, lns.14-15. "Mr. Williams did not engage in any services in the development of the lots." Opposition to Objection (titled Reply) at 6, ln. 21.

Mr. Williams told a different story at his June 25, 2010 deposition. He said that he "created Integra Development Group as [they] were getting into . . . some of the development stuff for the lot, hoping that [he] might be able to earn some consulting or project management fees as a part of developing . . . these duplexes." See Docket 91, Ex. F at 80-81. And, as to the $3,874 payment, he said that he "[does not] recall the exact specifics of this $3,874, but there was some fee associated with some work that theoretically [he] did from a project management perspective for Kenneth Development associated with these lots." See Docket 91, Ex. F at 81.

The above testimony of Mr. Williams is supported by the description of the work he and KD did to prepare the lots for building. "We did a host of things that we spent money on that . . . that's required as part of a overall [sic] package that you submit . . . to get . . . tentative map approvement [sic] or something like that. And so we did those things." See Docket 91, Ex. F at 77. "So we submitted plans. We spent money on an engineering firm to . . . review . . . various regulatory sort of issues with the land. We did flora and fauna studies. We did

-8-

transportation department studies." Id. "[F]rom the time we

purchased it for maybe couple, three years, we worked on it.

Till finally we got to the point where the real estate market had

declined." Id.

Mr. Williams says that "[a]ll payments relating to the

development of the Pensco IRA real property were made to third

parties through the Pensco IRA." See Docket 99, John Williams

Decl. ¶ 5.

However, while payments relating to the development of the

IRA lot may have been made through the Pensco IRA, the fact

remains that Mr. Williams performed consulting and/or project

management services for the development of the IRA lot.

His only declaration in response to this objection does not

deny providing the services. He states only that he never

"*completed* any services in regards to the lot owned by [the

Pensco IRA]." See Docket 99, John Williams Decl. ¶ 6. This is

not the same as him saying that he never performed any services.

He may have not completed the services, but he did provide some

services.

The court is not persuaded that only KD worked on the lot

development project. KD may have taken the lead, as Mr. Williams

testified, but some of the work was performed by Mr. Williams.

This is further substantiated by Mr. Williams' reference to

himself and KD as "we" in his deposition, when describing the

work on the project. See Docket 91, Ex. F at 77-79. Both KD and

Mr. Williams worked on the project.

The work performed by Mr. Williams is also evidenced by the

$3,874 payment to IDG c/o John Williams, made by KD in 2005. See

Docket 91, Ex. L.   The debtors argue that the payment from KD was on account of work Mr. Williams performed through IDG on the construction of the debtors' residence.   Mr. Williams says that he paid the invoice from KD out of a construction loan on the residence and then KD paid IDG.   See Docket 99, John Williams Decl. ¶ 7.

But, Mr. Williams' version of the facts is not supported by the record.   KD paying Mr. Williams for work Mr. Williams did on his own residence makes little sense.   More importantly, at his June 25, 2010 deposition, Mr. Williams unequivocally testified that the payment from KD was for work Mr. Williams did on the lots.   The court is not persuaded by Mr. Williams' sudden change in testimony.   Also, the payment could not have been in connection with KD's work on the debtors' residence because KD did not make the payment directly to Mr. Williams.   KD paid IDG, which according to Mr. Williams was formed for the purpose of Mr. Williams "earn[ing] some consulting or project management fees as a part of developing . . . [the] duplexes" on the IRA lot.   See Docket 91, Ex. F at 80-81.

Hence, on the one hand, Mr. Williams paid funds from the Pensco IRA to third parties, including KD, for the development of the IRA lot.   Yet, on the other hand, third parties, including KD, hired IDG in order for Mr. Williams to do consulting and/or project management work on the development of the lots, including the IRA lot.   When KD paid IDG, IDG was paying him for the work he did on the lots.   As Mr. Williams said, he established IDG so he can earn some consulting or project management fees.   See Docket 91, Ex. F at 80-81.

1     Additionally, many of the material factual statements in the

2  opposition to the objection are not supported by evidence.  For

3  instance, in the opposition, the debtors say that "Mr. Williams

4  did not engage in any services in the development of the lots."

5  See Opposition (titled Reply) at 6.  This statement is not

6  supported by the declaration of Mr. Williams.  His declaration

7  does not say that he did not provide any services.  It merely

8  says that he "never . . . completed any services in regards to

9  the lot[s]."  See Docket 99 Williams Decl. ¶ 6.

10     Also, none of the exhibits attached to the opposition are

11  authenticated by a supporting declaration.  Despite this, there

12  is nothing in those exhibits that would change the court's mind

13  about the outcome of the trustee's objection to the exemptions.

14     The court concludes that Mr. Williams engaged in prohibited

15  transactions with the Pensco IRA under 26 U.S.C. § 4975(c)(1)(C).

16     The court further concludes that Mr. Williams engaged in

17  prohibited transactions with the Pensco IRA under 26 U.S.C. §

18  4975(c)(1)(E) and (F), which include "act[s] by a disqualified

19  person who is a fiduciary whereby he deals with the income or

20  assets of a plan in his own interest or for his own account" or

21  "receipt of any consideration for his own personal account by any

22  disqualified person who is a fiduciary from any party dealing

23  with the plan in connection with a transaction involving the

24  income or assets of the plan."

25     As noted above, in Mr. Williams' own words, he "created

26  Integra Development Group as [they] were getting into . . . some

27  of the development stuff for the lot, hoping that [he] might be

28  able to earn some consulting or project management fees as a part

-11-

of developing . . . these duplexes." <u>See</u> Docket 91, Ex. F at 80-81.  And KD, which had taken the lead on the development of the Pensco lot, paid $3,874 to IDG for work Mr. Williams did in connection with the development of the lot.  <u>See</u> Docket 91, Ex. F at 79-80 & Ex. L; Docket 91, Ex. F at 81.  Once again, at his deposition, Mr. Williams stated that the payment was for "some work that theoretically [he] did from a project management perspective for Kenneth Development associated with these lots." <u>See</u> Docket 91, Ex. F at 81.

In other words, Mr. Williams dealt with the property of the Pensco IRA for his own personal interest, and received consideration for his own personal account from KD.

Under the step transaction doctrine, the fact that KD paid IDG and not Mr. Williams directly is irrelevant.  The doctrine "collapses formally distinct steps in an integrated transaction in order to assess federal tax liability on the basis of a realistic view of the entire transaction." <u>See</u> <u>Linton v. United States</u>, 630 F.3d 1211, 1223 (9th Cir. 2011).  "The step transaction doctrine treats multiple transactions as a single integrated transaction for tax purposes if all of the elements of at least one of three tests are satisfied: (1) the end result test, (2) the interdependence test, or (3) the binding commitment test."  <u>Id.</u> at 1224.  "The end result test asks whether a series of steps was undertaken to reach a particular result, and, if so, treats the steps as one."  "Under this test, a taxpayer's subjective intent is 'especially relevant,' and we ask 'whether the taxpayer intended to reach a particular result by structuring a series of transactions in a certain way.'" <u>Id.</u> at 1224

(quoting <u>True v. United States</u>, 190 F.3d 1165, 1175 (10th Cir. 1999)).

While IDG received the $3,874 payment from KD, Mr. Williams admitted that he established IDG so he could personally benefit from the development of the Pensco lot.  The court then will treat the payment to IDG as a payment to Mr. Williams personally.

Given the foregoing, the court concludes that the Pensco IRA ceased to be a tax exempt IRA as of January 1, 2005, the year Mr. Williams received the payment from KD.  See 26 U.S.C. § 408(e)(2)(A) (stating that "during any taxable year of the individual for whose benefit any individual retirement account is established, that individual or his beneficiary engages in any transaction prohibited by section 4975 with respect to such account, such account ceases to be an individual retirement account as of the first day of such taxable year").  Because the Pensco IRA lost its IRA status, it is not exempt from taxation under 26 U.S.C. § 408(e)(1) and does not qualify for exemption under 11 U.S.C. 522(b)(3)(C).  Also, the debtors have not alleged an exemption from taxation under any of the other enumerated provisions in 11 U.S.C. § 522(b)(3)(C), §§ 401, 403, 408A, 414, 457, or 501(a) of the IRC.

For the first time in papers filed April 6 and at oral argument on April 11, once again the debtors changed their story as to Mr. Williams' role in the development of the IRA's vacant lot and the adjacent lot.  They argue now that Mr. Williams provided services in the development of the lots, but those services were "necessary for the establishment or operation of the plan," as prescribed by 26 U.S.C. § 4975(d)(2), which

provides:

> Except as provided in subsection (f)(6), the
> prohibitions provided in subsection (c) shall not apply
> to - . . . (2) any contract, or reasonable arrangement,
> made with a disqualified person for office space, or
> legal, accounting, or other services necessary for the
> establishment or operation of the plan, if no more than
> reasonable compensation is paid therefor.

26 U.S.C. § 4975(f)(6) does not apply to the Pensco IRA

because the provision's application is limited only to "the case

of a trust described in section 401(a)." IRAs on the other hand

are trusts established under section 408 of the IRC.

According to the debtors, for purposes of section

4975(d)(2), a service is a "necessary service" if it "is

appropriate and helpful to the plan obtaining the service in

carrying out the purposes for which the plan is established or

maintained." 26 C.F.R. § 54.4975-6(a)(2).

The debtors did not make this argument in their opposition

to the objection. Opposition to Objection (titled Reply) at 5-7.

This argument has been waived. They raised this argument for the

first time in papers filed April 6 and at the April 11 hearing,

even though the court unequivocally told the parties at the March

28 hearing that it is not reopening the record for additional

argument or evidence by continuing the objection from March 28 to

April 11.

Moreover, the debtors' initial opposition to the objection,

of March 11, 2011 (Docket 96), denies that Mr. Williams provided

services in the development of the lots. See Docket 96,

Opposition to Objection (titled Reply) at 6, ln. 21 (stating that

"Mr. Williams did not engage in any services in the development

of the lots"). Judicial estoppel precludes the debtors from now

arguing that Mr. Williams did provide services for the development of the lots.

Judicial estoppel precludes parties from gaining advantage by asserting one position in a case, and then later seeking an advantage by taking a clearly inconsistent position. <u>See</u> <u>Hamilton v. State Farm Fire & Cas. Co.</u>, 270 F.3d 778, 782 (9th Cir. 2001). "This court invokes judicial estoppel not only to prevent a party from gaining an advantage by taking inconsistent positions, but also because of 'general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings,' and to 'protect against a litigant playing fast and loose with the courts.'" <u>Id.</u> (quoting <u>Russell v. Rolfs</u>, 893 F.2d 1033, 1037 (9th Cir. 1990)).

In this case the debtors are seeking to gain an advantage by taking inconsistent positions in the case, first by claiming that Mr. Williams performed no services for the development of the Pensco lot, and then by claiming that he did perform services but that such services were not a prohibited transaction.

Even if he is not judicially estopped from making the argument, it is hardly persuasive given that it is raised in the face of the assertion that no services were provided.

Further, the trouble with the new section 4975(d)(2) argument is that, according to 26 C.F.R. § 54.4975-6(a)(1):

> [S]ection 4975(d)(2) does not contain an exemption for acts described in section 4975(c)(1)(E) (relating to fiduciaries dealing with the income or assets of plans in their own interest or for their own account) *or acts described in section 4975(c)(1)(F)* (relating to fiduciaries receiving consideration for their own personal account from any party dealing with a plan in connection with a transaction involving the income or assets of the plan). Such acts are separate

-15-

transactions not described in section 4975(d)(2). (Emphasis added).

26 C.F.R. § 54.4975-6(a)(5) also provides:

(i) In general. *If the furnishing of* office space or *a service involves an act described in section 4975(c)(1)(E) or (F) (relating to acts involving conflicts of interest by fiduciaries), such an act constitutes a separate transaction which is not exempt under section 4975(d)(2).* The prohibitions of sections 4975(c)(1)(E) and (F) supplement the other prohibitions of section 4975(c)(1) by imposing on disqualified persons who are fiduciaries a duty of undivided loyalty to the plans for which they act. These prohibitions are imposed upon fiduciaries to deter them from exercising the authority, control, or responsibility which makes such persons fiduciaries when they have interests which may conflict with the interests of the plans for which they act. In such cases, the fiduciaries have interests in the transactions which may affect the exercise of their best judgment as fiduciaries. Thus, a fiduciary may not use the authority, control, or responsibility which makes such person a fiduciary to cause a plan to pay an additional fee to such fiduciary (or to a person in which such fiduciary has an interest which may affect the exercise of such fiduciary's best judgment as a fiduciary) to provide a service. Nor may a fiduciary use such authority, control, or responsibility to cause a plan to enter into a transaction involving plan assets whereby such fiduciary (or a person in which such fiduciary has an interest which may affect the exercise of such fiduciary's best judgment as a fiduciary) will receive consideration from a third party in connection with such transaction.

A person in which a fiduciary has an interest which may affect the exercise of such fiduciary's best judgment as a fiduciary includes, for example, a person who is a disqualified person by reason of a relationship to such fiduciary described in section 4975(e)(2)(E), (F), (G), (H), or (I)." (Emphasis added).

Therefore, even if the debtors had not waived the argument, to the extent 26 U.S.C. § 4975(d)(2) applies to Mr. Williams' transactions with the Pensco IRA, his prohibited transactions under 26 U.S.C. § 4975(c)(1)(E) and (F), as described above, are not affected.  They remain prohibited transactions.

-16-

Also, with respect to section 4975(c)(1)(C), to the extent Mr. Williams' services included consulting and/or management of the development of the IRA lot, the debtors have not explained how such services meet the "necessary for the establishment or operation of the IRA" requirement of section 4975(d)(2).  At the April 11 hearing, the debtors merely cited to section 4975(d)(2), without providing the court with the factual analysis for how the debtors have met 26 U.S.C. § 4975(d)(2)'s "necessary for the establishment or operation of the plan" requirement.  There is no evidence demonstrating that Mr. Williams' services were truly necessary for the operation of the IRA.

Lastly, the trustee argues that the IRA does not consist of "retirement funds," as required by 11 U.S.C. § 522(b)(3)(C), because the IRA owns a vacant lot in Cameron Park, California.

Although the court has found no court decision interpreting what "retirement funds" means within the context of 11 U.S.C. § 522(b)(3)(C) or 11 U.S.C. § 522(d)(12), which has the identical language of section 522(b)(3)(C), the court is not prepared to conclude that "retirement funds" exclude real property assets. All IRAs have some form of investment assets.  Most often, IRAs hold liquid assets, including stocks and/or bonds.  But IRAs rarely have only "funds" in the strictest sense of that word. Thus, to construe "retirement funds" to exclude assets, whether stocks, mutual funds, bonds, or real estate, would make the § 522(b)(3)(C) exemption largely unusable.

///
///
///

B. Mr. Williams' 401k

     With respect to Mr. Williams' 401k, the court is not
prepared to conclude that the transferor IRA Mr. Williams used to
transfer funds and open the Pensco IRA was tainted, resulting in
a prohibited transaction when Mr. Williams subsequently used the
same transferor IRA to open the subject 401k.  There is no
evidence that Mr. Williams opened the Pensco IRA with the intent
to engage in the prohibited transactions in connection with the
Pensco IRA.  According to the trustee, the Pensco IRA was
established in April and May 2004.  But, the strongest evidence
of a prohibited transaction as to the Pensco IRA is from 2005,
when KD made the $3,874 payment to Mr. Williams via IDG.  The
evidence that Mr. Williams intended to engage in prohibited
transactions when he established the Pensco IRA is weak at best.

     Further, the court will overrule the objection that Mr.
Williams' 401k does not qualify under the IRC because it was not
updated by April 30, 2010.  The objection does a poor job of
briefing the issue.  It simply says that the debtors should have
updated the 401k by April 30, 2010 pursuant to the requirements
of 26 U.S.C. § 401(a) and/or IRS Announcement 2008-23.

     The objection does not cite to the provision in 26 U.S.C. §
401(a) requiring the update, it does not say what the IRS
Announcement provides and requires, and it does not say what it
takes for a 401k to be updated pursuant to the requirements of
the IRS.

///

///

///

-18-

C. <u>Mrs. Williams' 401k</u>

With respect to Mrs. Williams' 401k, 401ks must comply with the requirements of 26 U.S.C. § 401. One of those requirements, in 26 U.S.C. § 401(a), is that the 401k plan be "of an employer for the exclusive benefit of his employees or their beneficiaries." 26 U.S.C. § 401 recognizes self-employed individuals as employers. "An individual who owns the entire interest in an unincorporated trade or business shall be treated as his own employer." 26 U.S.C. § 401(c)(4). And, "[t]he term 'employee' includes, for any taxable year, an individual who is a self-employed individual for such taxable year." 26 U.S.C. § 401(c)(1)(A). "The term 'self-employed individual' means, with respect to any taxable year, an individual who has earned income (as defined in paragraph (2)) for such taxable year." 26 U.S.C. § 401(c)(1)(B).

The trustee argues that Mrs. Williams' 401k is a "sham" because it does not have an adopting employer as required by 26 U.S.C. § 401(a).

The 401k was originally established in 2004 with SunAmerica as the plan administrator. The adoption agreement with SunAmerica, the 401k account application, and the designation of beneficiary form do not list an adopting employer for Mrs. Williams' 401k. <u>See</u> Docket 91, Ex. J.

In 2007, Mrs. Williams switched plan administrators to Pershing. <u>See</u> Docket 91, Ex. H. While the 2007 adoption agreement lists "Rena E. Williams Real Estate," as the adopting employer, Mrs. Williams has stated that the "Real Estate" portion of the employer's name was a clerical error. <u>See</u> Docket 98, Rena

-19-

Williams Decl. ¶ 4; Docket 91, Ex. H.  According to Mrs.
Williams, she has never done business under the name "Rena E.
Williams Real Estate."  See Docket 91, Ex. G at 8.  In essence,
Mrs. Williams asserts that under the 2007 adoption agreement her
adoption employer was herself, Rena E. Williams.

However, assuming Mrs. Williams listed herself as the
adopting employer in the 2007 adoption agreement, there is no
evidence in the record that Rena E. Williams was an employer in
2007 under the definition of 26 U.S.C. § 401(c)(4).  Within the
context of self-employed individuals, only "[a]n individual who
owns the *entire* interest in an unincorporated trade or business
shall be treated as his own employer."  26 U.S.C. § 401(c)(4).
In other words, for Mrs. Williams to have been her own employer
in 2007, she must have owned the entire interest in an
unincorporated trade or business.

The record reveals two sources of income for Mrs. Williams
in 2007.  Based on the unauthenticated exhibits attached to the
debtors' opposition, Mrs. Williams worked for Comstock Mortgage
in 2007.  See Ex. D to Opposition (titled Reply).  Comstock
issued a W-2 income statement to Mrs. Williams, indicating she
earned $32,590.15 in compensation.

Also, in their 2007 tax Schedule C (Profit or Loss From
Business), Mr. Williams and Mrs. Williams are both listed as the
proprietors of a mortgage business, Strategy First Mortgage,
reporting gross receipts of $121,824.  See Ex. D to Opposition
(titled Reply); see also Docket 91, Ex. I.  Only the social
security number of Mr. Williams is listed in connection with SFM.
///

The record contains no evidence that Mrs. William had any income in 2007 from SFM.

Further, SFM is not listed as Mrs. Williams' employer in the 2007 401k adoption agreement with Pershing. And, even if the court would assume that SFM is the intended adopting employer in the 2007 401k adoption agreement, there is no evidence that Mrs. Williams owned the entire interest in SFM in 2007, meaning that she was not entitled to list herself as the adopting employer. The 2007 tax Schedule C indicates that SFM was owned at the time by both Mr. Williams and Mrs. Williams. They are both listed as proprietors.

For the first time in papers filed April 6 and orally at the April 11 hearing, the debtors advanced additional arguments about Mrs. Williams' 401k. They argue that: (1) even though Mrs. Williams may not have had self-employment income in 2007, she had self-employment income all other years; (2) SFM was Mrs. Williams' adopting employer in 2007 under the partnership clause (second sentence) of 26 U.S.C. § 401(c)(4) as Mrs. Williams was a partner of SFM; and (3) pursuant to 26 U.S.C. § 414(c), Mrs. Williams is employed by a single employer as she is an employee of businesses, namely SFM and her sole proprietorship business, which are under common control.

The partnership and common control arguments were not pursued by the debtors in their opposition to the objection. The court did not permit additional argument or evidence after the March 28 continuance of the objection. Those arguments were waived.

///

-21-

Nevertheless, the new arguments lack merit.  26 U.S.C. § 401(c)(4) provides: "A partnership shall be treated as the employer of each partner who is an employee within the meaning of paragraph (1)."

However, there is no evidence in the record that Mrs. Williams had SFM partnership interest in 2007.  Conversely, the evidence points in the other direction.  SFM was not a partnership in 2007.  The debtors' 2007 tax return does not contain IRS Form 1065 or 1065-B, which is required for partnership businesses.  See Docket 91, Ex. I, Schedule C.  The 2007 return contains only SFM's Profit and Loss From Business form, also known as IRS Schedule C.  Id.  The court is not persuaded that Mrs. Williams had SFM partnership interest in 2007.

Further, 26 U.S.C. § 414(c) provides that:

> For purposes of sections 401, 408(k), 408(p), 410, 411, 415, and 416, under regulations prescribed by the Secretary, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer. The regulations prescribed under this subsection shall be based on principles similar to the principles which apply in the case of subsection (b).

As already noted above, Mrs. Williams had only two sources of income in 2007, W-2 income from Comstock Mortgage and 1099 income from SFM.  See Docket 91, Ex. I.  Mrs. Williams did not have her sole proprietorship mortgage business in 2007.  There was no earned income reported in 2007 from Mrs. Williams' alleged sole proprietorship mortgage business.  See 26 U.S.C. § 401(c)(1)(B) (defining "'self-employed individual' [as] an individual who has earned income (as defined in paragraph (2)

[net earnings from self-employment]) for such taxable year."

The only business then Mrs. Williams could have listed as an adopting employer was SFM.  This means that the "common control businesses" requirement of 26 U.S.C. § 414(c) is not satisfied.

Mrs. Williams' 401k lost its preferred tax treatment under section 401(a) because Mrs. Williams did not have an adopting employer in 2007.  See 26 U.S.C. § 401(a) (requiring the plan to be "of an employer").  It lost preferred tax treatment also because it violated section 401(a)(14), which provides:

> A trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that, unless the participant otherwise elects, the payment of benefits under the plan to the participant will begin not later than the 60th day after the latest of the close of the plan year in which –
>
> > (A) the date on which the participant attains the earlier of age 65 or the normal retirement age specified under the plan,
> >
> > (B) occurs the 10th anniversary of the year in which the participant commenced participation in the plan, or
> >
> > (C) the participant terminates his service with the employer.
>
> In the case of a plan which provides for the payment of an early retirement benefit, a trust forming a part of such plan shall not constitute a qualified trust under this section unless a participant who satisfied the service requirements for such early retirement benefit, but separated from the service (with any nonforfeitable right to an accrued benefit) before satisfying the age requirement for such early retirement benefit, is entitled upon satisfaction of such age requirement to receive a benefit not less than the benefit to which he would be entitled at the normal retirement age, actuarially, reduced under regulations prescribed by the Secretary.

"Qualified 401(k) plans are required to completely pay out benefits to plan participants no later than 60 days following the

termination of employment, unless the plan participant elects otherwise." See In re Ladd, 258 B.R. 824, 826 (2001) (citing 26 U.S.C. § 401(a)(14)).

The absence of an adopting employer in 2007 terminated Mrs. Williams' employment for purposes of section 401(a)(14)(C). Without an adopting employer, Mrs. Williams had no employment for purposes of section 401(a). Yet, there is nothing in the record indicating that the 401k "completely pay[ed] out [the] benefits" to Mrs. Williams "no later than 60 days following the termination of [her] employment."

The debtors have not produced persuasive evidence that Mrs. Williams had a qualified adopting employer in 2004, when the 401k was originally established, or in 2007, when Mrs. Williams changed plan administrators. See Opposition (titled Reply) at 8; see also Docket 91, Ex. J. The debtors also have not produced sufficient evidence to show that the 401k complied with 26 U.S.C. § 401(a)(14), when Mrs. Williams' employment terminated sometime in 2007. Mrs. Williams' only declaration in response to the objection is silent on these issues. See Docket 98, Rena Williams Decl.

The debtors then are not entitled to claim an exemption under 11 U.S.C. § 522(b)(3)(C) in Mrs. Williams' 401k.


III

Finally, the court continued the hearing on the objection from March 28, 2011 because the debtors' counsel claimed at the hearing that he did not have an opportunity to take the deposition of the trustee's expert witness. The trustee has

filed additional evidence that demonstrates otherwise.

The debtors' attorney was served with the trustee's expert witness report on February 9, 16 days prior to the February 25, 2011 filing of the amended objection to the debtors' exemptions. See Docket 104, Hughes Decl. ¶ 17; see also Docket 105, Exhibits B-D to Hughes Decl.  And, on February 9, when the trustee served the report, he offered the debtors the opportunity to take the expert's deposition, despite the looming February 11 discovery cut-off.  See Docket 104, Hughes Decl. ¶¶ 13, 16, 17; see also Docket 105, Exhibit B to Hughes Decl.  Counsel for the debtors did not reply to the offer and the trustee filed the instant objection on February 25.  See Docket 104, Hughes Decl. ¶¶ 18-21.

The court is not persuaded that the debtors' counsel did not receive the e-mail sent to him by the trustee's counsel on February 9.  The declaration of the debtors' counsel simply says "I did not receive the email."  See Docket 109, Coggins Decl. ¶ 15.  He does not say whether he even searched for the e-mail.  He does not say whether he received the report of the trustee's expert, served on him by electronic mail also on February 9.  He makes no mention of the e-mail sent to him on February 24, when the trustee once again referenced the report of his expert.

And, the debtors have not explained why the alleged nondisclosure of the expert witness was not raised in their March 11 written opposition to the objection.  They waited until the March 28 hearing to raise the issue, after the court had issued a tentative ruling on the objection.

Despite the absence of anything in their opposition regarding non-receipt of the report, the court indulged the

-25-

debtors and continued the hearing to April 11, 2011 to permit the
parties to address that one issue.  Rather than address the
issue, the debtors made several new arguments regarding the merit
of the objection to their exemptions.  <u>See</u> <u>also</u> Docket 108.

    Even if the court were to overlook the debtors' failure to
respond to the trustee's offer to allow the expert's deposition,
the further evidence geared to discrediting the trustee's
expert's opinion will not change the court's ruling.  The court
has not relied on the trustee's expert witness in its ruling.

    Therefore, the court will not give the debtors additional
time to depose the expert retained by the trustee.


                                IV

    For the reasons explained above, the objection to the
debtors' exemptions will be sustained in part.  Counsel for the
trustee shall lodge a conforming order.

Dated: 3 June 2011

                              By the Court

                              _____
                              Michael S. McManus, Judge
                              United States Bankruptcy Court

                              -26-